528 So.2d 144 (1988)
Elizabeth A. MOHR
v.
STATE FARM INSURANCE COMPANY.
Elizabeth A. MOHR
v.
Edward G. BROUSSARD, et al.
Nos. 88-C-0110, 88-C-0113.
Supreme Court of Louisiana.
May 23, 1988.
Opinion Concurring and Dissenting in Part May 25, 1988.
Rehearing Denied September 8, 1988.
*145 Harvey Strayhan, Sessions, Fishman, Rosenson, Boisfontaine & Nathan, New Orleans, for applicant in 88-C-0110.
James Shields, Gretna, Lawrence Chisholm, River Ridge, for respondent in 88-C-0110.
Joseph Ward, Jr., Patrick Lee, Ward & Clesi, Donald Hoffman, George J. Nalley, Jr., Lawrence J. Centola, Jr., Carmouche, Gray & Hoffman, New Orleans, Lawrence J. Duplass, Bernard J. Williams, Duplass, Witman & Zwain, Metairie, Harvey Strayhan, Sessions, Fishman, Rosenson, Boisfontaine & Nathan, New Orleans, for respondent in 88-C-0113.
WATSON, Justice.
On February 26, 1981, the plaintiff in these consolidated suits, Elizabeth A. Mohr, suffered severe personal injuries while driving north on Highway 23 near Venice, Louisiana. She hit a tractor-trailer which was attempting a U-turn across the highway and blocking both northbound lanes of traffic. Driver Edward [Edmond] G. Broussard was traveling in convoy with two other drivers, Stelly and Trahan, and the three were returning from a delivery in Venice.
Prior to trial, plaintiff settled with Broussard, H & H Rentals, Inc., owner of the Broussard truck, and American Mutual Liability Insurance Company for the policy limits of $300,000.[1] In addition, plaintiff was paid $10,000 under the uninsured motorist coverage of the policy issued by Bellefonte Insurance Company to Sims Welding Company, Inc., plaintiff's employer and the owner of the vehicle she was driving at the time of the accident.
In the Broussard suit, a jury concluded that Stelly and Trahan were not negligent, assigned sixty percent of the fault to Broussard and forty percent to Mohr. Although the jury found that Broussard was employed by Acme Truck Line, Inc., it decided that he was not in the course and scope of that employment at the time of the accident and was not driving a vehicle owned, leased or borrowed by Acme. Plaintiff's damages were fixed at $500,000.
In the Broussard suit, the court of appeal[2] found no manifest error in the jury's conclusion that Stelly and Trahan were free from negligence because they had no duty to secure the highway for Broussard. Because Broussard's Acme truck had broken down, he secured an H & H truck for this trip and was paid by H & H for the week of the accident. Therefore, the court of appeal found no manifest error in the jury's conclusion that Broussard was functioning solely as an employee of H & H at the time of the accident. The trial judge's conclusion that Broussard was not insured by Fidelity and Casualty Company of New York, Acme's insurer, as the driver of a substitute vehicle, was also affirmed. There was evidence supporting the jury's conclusion that plaintiff was speeding and therefore forty percent at fault. Although the trial court erroneously allowed the settlement agreement between Mohr, Broussard, H & H, and American Mutual to be admitted into evidence, this was found to be harmless error. The jury fixed damages at $500,000 and this was interpreted by the trial judge to require a forty percent reduction for comparative fault. The court of appeal questioned whether that was actually the jury's intention and concluded that $1 million was the lowest figure which could be placed on Mohr's damages. Damages were therefore fixed at $600,000 subject to the prior credits.
The companion case against State Farm Insurance Company, Mohr's personal insurer, was tried to a judge who dismissed the suit on the ground that there was adequate coverage on the vehicle being driven by *146 Mohr under the Bellefonte policy, the $1 million umbrella policy issued to Sims by Underwriters at Lloyd's, London and the settlement entered into with Broussard's insurer.
The Underwriters' policy is the subject of a separate suit not now before this court. The Underwriters' policy requires underlying limits of $500,000. The Bellefonte policy has underlying liability limits of $500,000 but only $10,000 in uninsured motorist coverage. Therefore, there is a gap in uninsured motorist coverage. The court of appeal reversed the trial court, which had dismissed the suit on exceptions; held that the Underwriters' policy provided coverage above $500,000;[3] and remanded to the trial court.
In the State Farm suit, the court of appeal reversed the trial court's dismissal of Mohr's suit and held that State Farm had to pay Mohr its $50,000 uninsured policy limits,[4] because the Underwriters' coverage was not available to her. Writs were granted to consider the judgments in Mohr v. State Farm and Mohr v. Broussard, et al.[5]
On the morning of the accident, Broussard, Stelly and Trahan reported to H & H Rentals, Inc. in Lafayette to pick up three seismic pontoons to be delivered to Southland Seismic in Venice, Louisiana. Stelly and Trahan were driving trucks which had been leased from Hardin Trucking Company, Inc., to Acme. Acme leases all of its vehicles; the primary service provided by Acme is use of its permit. Acme's drivers are paid on a per trip percentage basis. They are covered by Acme's insurance policy only when driving trucks leased or dispatched by Acme.
Broussard was employed by Acme from March of 1980 until he was terminated in August of 1981, long after the accident. His truck had been dispatched by Acme on the morning of the accident. When it broke down, he took an H & H vehicle without informing Acme. Acme's position was that Broussard lost his employee status when the Acme truck broke down. Fellow driver Trahan testified that he would also have called the truck owner rather than lessee Acme in case of a break down.
Both Trahan and Stelly were under the impression that their trucks were owned by H & H. However, there was testimony that they were owned by H & H's sister company, Hardin Trucking Company, Inc.[6] Only Broussard's truck and trailer were owned by H & H Rentals, which paid Broussard for that week.
H & H's truck pusher, James Wilkerson, dispatched the three trucks to Venice. Wilkerson received a percentage from Acme for dispatching their trucks.
The three trucks carried oversized loads and traveled in convoy with radio communication. After they had jointly delivered the pontoons, Trahan called Wilkerson and the drivers started back to Lafayette. Between Venice and Belle Chasse, they decided to return to Venice and eat. The three trucks pulled to the shoulder to make U-turns across the highway; that manoeuvre blocked both the southbound and northbound lanes. After Trahan and Stelly had cleared the intersection and were southbound, Broussard attempted his U-turn and the rear wheels of the trailer were hit by Ms. Mohr's automobile.
Stelly admitted he had been concerned about traffic conjestion and safety when the turn was made and was only able to make his turn because the southbound traffic yielded the right-of-way. When a southbound vehicle signaled him through the intersection, he announced this on his CB radio and completed the turn. Southbound traffic was still present when Broussard started his turn. Stelly was driving a sixty-eight foot twenty-two wheeler; Trahan and Broussard were driving fifty-five foot *147 eighteen wheelers. Following the accident, Trahan called dispatcher Wilkerson and reported what had happened. Broussard's trailer was then loaded by the three truck drivers onto Stelly's trailer and taken back to H & H.
There was expert testimony that the accident was caused by all three trucks because the turns were dangerous and traffic should have been flagged if the turns were necessary. The gap between the first two trucks and the third one gave motorists an illusion that the danger had passed. The turns violated Louisiana law and created a hazard for other motorists.
According to an eye-witness, Jessie Ledet, Sr., his car and two other vehicles had slowed down to let the two large trucks make their U-turns across the highway. When the two trucks cleared the northbound lanes and headed south, he resumed his speed. Suddenly, a third truck "whipped out in front of everybody."[7] Ledet was in the left lane and a Suburban truck was in the right lane. He had just passed the truck and was "fixing to pass her [Mohr]"[8] after she had previously passed him in the right lane. Ledet was "lucky";[9] he avoided the accident by hitting the grass in the neutral ground and pulling his emergency brake. Mohr skidded in front of Ledet, then back to the right, before hitting the rear of the truck's trailer. "[S]he was looking for a way out because I almost hit her. She must have been thinking the same thing I was, to go across the median. But they had traffic coming and if I went across the median, I would have hit somebody head on which would have been worse. She went back into the other lane and I imagine she was looking to go around him on this area. But he had that blocked, too, they had a big ditch to that side, and it looked bad for a while. I locked up my emergency brakes and I hit the grass, I was worried about going to the other lanes also."[10] Ledet stopped about five car lengths from the truck.
According to a defense eye witness, Roland Leonard, there was an Acme sign on the door of the truck driven by Broussard.[11] This was the only truck Leonard saw. Both Leonard and Ledet said the accident happened very quickly.
Another eye-witness, Rodney Buras, lived adjacent to the highway. Hearing squealing brakes and blowing horns, he looked up and saw two trucks making U-turns. The second truck had to back up to allow the first truck to make its turn. At that time of day, about 5:00 P.M., there is a lot of traffic. A third truck was waiting on the shoulder. Buras confirmed that the accident happened very quickly after the third truck pulled across the northbound lanes.
There was conflicting expert testimony about Mohr's speed: estimated at between 45 and 55 and also at 70 miles per hour. There was testimony that she could have avoided the accident if she had been driving 55 miles per hour. Her impact speed was between 20 and 30 miles per hour and her car left 167 feet of skid marks.
As a result of the accident, Mohr has had extensive medical treatment for her multiple injuries including: two discograms; three cervical fusions; breast surgery; three knee operations; and surgery to repair a cracked pelvis and dislocated femur. She suffers from post-traumatic epilepsy, transient global amnesia, visual problems, brain damage, headaches, amenorrhea or cessation of menstruation, a broken rib, damage to her uterus, internal scarring in the area of her right tube and ovary, external scarring, depression and despair.
Mohr's former employer, Nathan Sims, testified that she was the most valuable, dedicated, and conscientious employee he had ever had. The company employed 200 to 250 people. As office manager, she had put the company into a money saving computer *148 system and also supervised its safety programs. When injured, she had been setting up a self-insurance program for the company and had undertaken numerous other duties. Sims had not realized how much she did until she was gone. Her salary of $1,600 per month had been scheduled to be raised to $2,150 a month on February 1, 1981, and $2,600 a month on September 1, 1982. Sims had stopped visiting Elizabeth Mohr approximately eighteen months before trial because her condition was so depressing, and he realized she would never return to work.
Elizabeth Mohr has past hospitalization expenses of $111,705.02. Her total past medical expenses are approximately $150,000. Her pre-trial loss of wages discounted at twelve percent after taxes amounted to $68,835.54. Born January 14, 1955, Elizabeth was 26 years old at the time of the accident with a life expectancy of 79.6 years or 50.6 additional years. Calculating a work life expectancy of 21.4 years, discounted to present value, her future lost wages would amount to $627,380.24. Assuming that she worked until age 65, her discounted future loss of earnings would be $999,575.56. Her future medical expenses were estimated at between $1,143,862.62 and $1,516,057.28. Without consideration of pain and suffering, her total losses were calculated by one expert at $539,712.60.
The overwhelming weight of the evidence was to the effect that Elizabeth Mohr is unemployable. She had formerly been an athletic super-achiever but has a bleak future. Three years after the accident, she is not functional and, according to her psychiatrist, is suicidal. She lost her fiance' as the result of the accident. He married another woman.
On the question of insurance coverage, the court of appeal was clearly correct. Under LSA-R.S. 22:1406 D(1)(c),[12] the uninsured motorist coverage on the vehicle in which the injured party was an occupant is primary. Both the Bellefonte and Underwriters' policies provide primary *149 coverage with a gap of $490,000. See Capone v. King, 467 So.2d 574 (La.App. 5 Cir.1985), writ den. 468 So.2d 1205 (La. 1985). Because Underwriters is only liable for the amount in excess of $500,000, there is no primary coverage available to plaintiff between $10,000 and $500,000. Washam v. Chancellor, 507 So.2d 806 (La. 1987).[13] Since Bellefonte and Underwriters essentially provide only one coverage, that is coverage on the Sims' automobile in differing amounts, Elizabeth Mohr is entitled to recover under her own uninsured motorist policy any excess over and above that primary coverage.
The court of appeal's determination that $1 million is the lowest figure which could reasonably be placed on Elizabeth Mohr's damages is correct.
Although the evidence as to Broussard's employment at the time of the accident was conflicting, the jury was not clearly wrong in determining that Broussard was not in the course and scope of his employment with Acme at the time of the accident and was not driving a substitute vehicle.
The jury's verdict in favor of Stelly and Trahan is not clearly wrong.
The jury's determination that Elizabeth Mohr was forty percent at fault in the accident is harsh and clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978). A professional truck driver who pulls out across the highway in front of traffic commits a shocking breach of his duty to drive safely. Faced with a sudden emergency, Elizabeth Mohr tried in vain to escape a collision. The question of comparative fault is, like contributory negligence, a matter of fact primarily within the province of a jury. Soileau v. South Central Bell Tel. Co., 406 So.2d 182 (La.1981). There was expert testimony that Elizabeth Mohr could have avoided the accident if she had been driving at a legal speed. Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985) holds that a jury's determination of comparative fault should not be affirmed merely because it has a reasonable basis. Eye witness Ledet did avoid a collision and stopped about five car lengths from the truck. However, he must have been driving faster than Mohr because he was "fixing" to pass her when the truck appeared. Ledet considered himself "lucky" to have avoided a collision. His testimony was that he almost hit Mohr's car while she looked for an escape from the entrapping truck.
The factors enumerated in Watson[14] for determining the degree of fault assigned are as follows:
"(1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties."
All the factors enumerated in Watson weigh in favor of Elizabeth Mohr. She was unaware of the danger and was, at most, inadvertent. The magnitude of the risk created by Broussard's truck; the insignificant nature of his purpose when *150 weighed against the risk; his knowledge as a professional driver of the danger involved; his superior vantage point and experience and the magnitude of the harm created all weigh in favor of a lesser degree of fault being assigned to Elizabeth Mohr. The degree of fault assigned to Elizabeth Mohr under the facts of this accident should be fifteen percent; to Broussard, eighty-five percent.
For the foregoing reasons, the judgments of the court of appeal are affirmed insofar as they determined: that $1 million is the lowest figure which could reasonably be placed on Mohr's damages; that Broussard was not in the course and scope of his employment with Acme at the time of the accident and was not driving a substitute vehicle; that Stelly and Trahan were not at fault; and that State Farm must pay its insured, Elizabeth Mohr, its $50,000 policy limits.
The judgments of the court of appeal and trial court are amended insofar as they assess fault of Elizabeth Mohr at forty percent; her degree of fault is fixed at fifteen percent.
AMENDED AND AFFIRMED.
LEMMON, J., concurs.
CALOGERO, J., concurs in part, dissents in part and assigns reasons.
DENNIS, J., concurs for the reasons assigned by CALOGERO, J.
CALOGERO, Justice, concurring in part and dissenting in part.
I agree with the majority that the jury was not clearly wrong when it found in favor of defendants Stelly, Trahan, and Acme Truck Lines. I also concur in the majority's conclusion that plaintiff is entitled to recover the proceeds of the State Farm U.M. policy. In light of this Court's decision in Washam v. Chancellor, 507 So. 2d 806 (La.1987), the Underwriters policy apparently can only apply to a judgment in excess of $500,000, and if so State Farm's policy accordingly should be applied against the resulting gap in U.M. coverage. Although Washam is possibly distinguishable from this case, I am not prepared to say that the majority is wrong as a matter of law when it concludes that there is a gap in U.M. coverage.
However, I dissent from the majority's decision to reduce the comparative fault allocation, a decision which I believe serves no purpose and has no practical effect, except, perhaps, to prejudice the position of Underwriters. Underwriters, of course, is not a party to either of the consolidated cases which are before us.
Because Stelly, Trahan, and Acme Truck Lines have been exonerated, State Farm is the only remaining defendant in this case who can be cast in judgment.[1] State Farm's policy limits are $50,000. The $600,000 judgment rendered by the court of appeal was more than sufficient to allow plaintiff to recover against State Farm.[2]
Thus, the majority's decision to increase quantum by decreasing the comparative fault assessment (from 40% to 15%) serves no purpose in this litigation. Theoretically, the majority decision means that the plaintiff is entitled to collect $850,000 (one million minus 15%) rather than $600,000 (one million minus 40%). However, there is no defendant in this lawsuit who will owe the balance of the increased judgment. The majority opinion has the curious effect of awarding the plaintiff a $250,000 increase in quantum that is effective against no one.
*151 Possibly, the majority's decision to increase quantum was prompted by the fact that plaintiff's separate suit for U.M. benefits against Underwriters at Lloyds is still pending before the district court. Perhaps the majority assumes that its opinion here will cause the trial judge in that case to allocate comparative fault at 15%. Similar motivations may have prompted the majority's surprising discussion of the propriety of the $1,000,000 quantum assessment made by the court of appeal.[3]
Regardless of whether the majority opinion is intended to influence the outcome of the Underwriters suit in this fashion, it will almost undoubtedly have that effect. While I do not believe that the district court in the Underwriters suit will be bound to follow the majority's views in this case on comparative fault and quantum[4], surely the trial judge, as a practical matter, will be hesitant to depart from the majority's findings on those issues. After all, that judge will know that any determination he makes in the Underwriters case, which involves the same accident and the same injuries, will ultimately be subject to review by this Court.
Because Underwriters is not a party to this lawsuit, I believe that it is improper for the majority to dispose of issues here which may affect Underwriters in the separate suit but which do not need to be determined in this case. Underwriters should have the opportunity to litigate its case free from the burden of the majority's unnecessary dicta on the amount of the damage award, and its unnecessary disposition of the comparative fault issue.
I do not address here whether there is merit to the majority's determination that the 40% comparative fault allocation was excessive under these facts. Instead, I base my partial dissent on the proposition that it was unnecessary for this Court to address that issue, particularly given the possible prejudice that will result to Underwriters, the insurer not a party in this suit.
For these reasons, I concur with the majority's disposition of the claims against Skelly, Trahan, Acme and State Farm, but respectfully dissent from the majority's decision to tamper with the comparative fault allocation.
NOTES
[1] The agreement provided for reimbursement to American Mutual of up to $100,000 in the event of recovery from other parties.
[2] Mohr v. Broussard, 515 So.2d 833 (La.App. 4 Cir.1987).
[3] Mohr v. Lloyds of London, 503 So.2d 557 (La. App. 4 Cir.1987).
[4] Mohr v. State Farm Ins. Co., 515 So.2d 840 (La.App. 4 Cir.1987).
[5] 519 So.2d 134 (La.1988).
[6] The two companies are primarily owned by members of the Hardin family and operate out of the same yard in Lafayette. They do employ separate bookkeepers.
[7] Tr. Docket No. 88-C-0113, Vol. 7, p. 47.
[8] Tr. Docket No. 88-C-0113, Vol. 7, p. 48.
[9] Tr. Docket No. 88-C-0113, Vol. 7, p. 38.
[10] Tr. Docket No. 88-C-0113, Vol. 7, p. 54.
[11] Tr. Docket No. 88-C-0113, Vol. 12, p. 137.
[12] LSA-R.S. 22:1406 D(1)(c) provides:

"D. The following provisions shall govern the issuance of uninsured motorist coverage in this state:
* * * * * *
"(c) If the insured has any limits of uninsured motorist coverage in a policy of automobile liability insurance, in accordance with the terms of Subsection D(1), then such limits of liability shall not be increased because of multiple motor vehicles covered under said policy of insurance and such limits of uninsured motorist coverage shall not be increased when the insured has insurance available to him under more than one uninsured motorist coverage provision or policy; provided, however, that with respect to other insurance available, the policy of insurance or endorsement shall provide the following:
"With respect to bodily injury to an injured party while occupying an automobile not owned by said injured party, the following priorities of recovery under uninsured motorist coverage shall apply:
"(i) The uninsured motorist coverage on the vehicle in which the injured party was an occupant is primary;
"(ii) Should that primary uninsured motorist coverage be exhausted due to the extent of damages, then the injured occupant may recover as excess from other uninsured motorist coverage available to him. In no instance shall more than one coverage from more than one uninsured motorist policy be available as excess over and above the primary coverage available to the injured occupant.
"(2)(a) For the purpose of this coverage, the term `uninsured motor vehicle' shall, subject to the terms and conditions of such coverage, be deemed to include an insured motor vehicle where the liability insurer thereof is unable to make payment with respect to the legal liability of its insured within the limits specified therein because of insolvency.
"(b) For the purposes of this coverage the term uninsured motor vehicle shall, subject to the terms and conditions of such coverage, also be deemed to include an insured motor vehicle when the automobile liability insurance coverage on such vehicle is less than the amount of damages suffered by an insured and/or the passengers in the insured's vehicle at the time of an accident, as agreed to by the parties and their insurers or as determined by final adjudication.
* * * * * *
"(4) In the event of payment to any person under the coverage required by this Section and subject to the terms and conditions of such coverage, the insurer making such payment shall, to the extent thereof, be entitled to the proceeds of any settlement or judgment resulting from the exercise of any rights of recovery of such person against any person or organization legally responsible for the bodily injury for which such payment is made, including the proceeds recoverable from the assets of the insolvent insurer."
[13] The Underwriters' policy had a provision similar to that in Washam, to-wit:

"It is a condition of this policy that the policy or policies referred to in the attached `Schedule of Underlying Insurances' shall be maintained in full effect during the policy period without reduction of coverage or limits except for any reduction in the aggregate limit or limits contained therein solely by payment of claims in respect of accidents and/or occurrences occurring during the period of this policy. Failure of the Named Assured to comply with the foregoing shall not invalidate this policy but in the event of such failure, the Underwriters shall only be liable to the same extent as they would have been had the Named Insured complied with said condition." 503 So.2d 557 at 560 (La.App. 4 Cir. 1987).
[14] 469 So.2d 967 at 974 (La.1985).
[1] The only party which the jury found negligent was Broussard, with whom the plaintiff settled prior to trial. The jury's determination in that regard was affirmed by both the court of appeal and the majority.
[2] The trial court entered judgment in favor of the plaintiff in the effective amount of $300,000 ($500,000 subject to a 40% comparative negligence reduction). Since plaintiff had received $310,000 in settlement prior to trial, the district court judgment was not large enough to allow her to recover on any U.M. claim. The court of appeal increased damages to $1,000,000 and maintained the 40% comparative fault assessment, resulting in a $600,000 recovery potential for plaintiff. After crediting the amount received in pre-trial settlements ($310,000), plaintiff was left with a $290,000 recovery potential, more than sufficient to exhaust State Farm's $50,000 policy limits.
[3] Surprising in that no party has assigned error to the court of appeal's $1,000,000 quantum determination.
[4] Certainly no aspect of the majority's holding can be res judicata with respect to the separate suit against Underwriters, because Underwriters is not a party here. Further, it is well established that Louisiana does not recognize the doctrine of collateral estoppel. See generally J. Dixon, R. Booksh & P. Zimmering, Res Judicata in Louisiana since Hope v. Madison, 51 Tul.L. Rev. 611 (1977).