598 So.2d 443 (1992)
Shelby Sue MURPHY, Individually and as Natural Tutrix of Her Minor Children, Jimmy Ray Murphy and Kristi Marie Murphy, Plaintiffs/Appellees,
v.
K.D. AUGER TRUCKING, INC., et al., Defendants/Appellants.
No. 23018-CA.
Court of Appeal of Louisiana, Second Circuit.
April 8, 1992.
Writ Denied July 1, 1992.
*446 Rabun, McCallum & Wilkerson by Jay B. McCallum and James M. Wilkerson, Farmerville, Theus, Grisham, Davis & Leigh by F. William Sartor, Jr., Monroe, for defendants-appellants.
Barham, Adkins & Tatum by Charles C. Barham, Ruston, for plaintiffs-appellees.
Before MARVIN, SEXTON, NORRIS, LINDSAY and STEWART, JJ.
NORRIS, Judge.
George Raymond Murphy was killed when the horse he was riding bolted into the path of an 18-wheeler driven by Prezell Phillips, an employee of K.D. Auger Trucking, Inc. Murphy's widow, Shelby Sue Murphy, brought suit individually and as natural tutrix for the couple's two minor children against Auger and its insurer, Laramie Insurance Co. Mrs. Murphy later amended her petition to name the Louisiana Insurance Guaranty Association (LIGA) as an additional defendant due to Laramie's insolvency. After trial, the court found total damages of $692,242.65, assigned 60% of the fault for the accident to Murphy, and held Auger and Laramie solidarily liable for 40%. Subsequent orders apportioned the damages among the three plaintiffs, substituted LIGA for Laramie and held LIGA liable in solido with Auger for its share of the damages. The final amended judgment held LIGA solidarily liable with Auger only up to the statutory limit of $149,900. La.R.S. 22:1382(1)(a).
Auger admits that Phillips was within the course and scope of his employment at the time of the accident. It appealed the judgment, however, arguing that the court erred in holding it liable for the accident or, in the alternative, that the percentage of fault assigned should have been less than 40%. Mrs. Murphy answered the appeal with thirteen assignments of error which contest certain items of damage and any assessment of comparative fault. LIGA did not appeal. We find the percentage of fault assigned to Auger excessive and amend the judgment accordingly; we affirm all other aspects of the judgment.

FACTS
The accident occurred on January 18, 1989 on Louisiana Highway # 2, a two-lane blacktop road running between Bernice and Farmerville. Murphy was boarding a six-year-old quarterhorse named Sissy. Prior to the accident, Ginger Smith, Murphy's sister-in-law, had taken Sissy out riding. On her return, she had tied the horse up outside the house with a halter at Murphy's request, leaving the saddle on. The knot Ms. Smith tied became loose and the horse went out on the highway. Ms. Smith and Murphy went in a truck to bring the horse back. Ms. Smith lured Sissy over to the truck with a bucket of feed and got hold of the halter. She planned to walk the horse back to the house, but Murphy told her he would ride Sissy back. Ms. Smith started driving the truck between the horse and the road, but Murphy told her to go home because he did not want her seen driving his employer's truck. Travelling east on the north shoulder some 12-18 feet from the pavement, Murphy rode the horse to the house and a short distance beyond. The shoulder was a broad, grassy area extending approximately 50 feet from the pavement to a fence.
At this time, two unloaded 18-wheel log trucks were travelling in the westbound lane, on the same side of the road as Murphy but going in the opposite direction. When the two drivers first saw Murphy *447 some 250-300 yards in front of the first truck, the horse was galloping along the shoulder toward them, apparently under control. The first driver, Bobby Hawthorne, testified that he had been travelling at approximately 62 m.p.h., but eased up on the accelerator when he saw the horse. As he came nearer, Hawthorne noticed that the horse's head was turned sideways. He estimated that he was about 12 feet from the horse when he saw that it was completely out of control; he then edged his truck over into the eastbound lane and slowed down. Phillips, who was driving the Auger truck, testified that he also slowed down when he first saw the horse; Hawthorne verified that Phillips must have slowed down some, because otherwise the Auger truck would have been much closer to Hawthorne than it was. Both drivers maintained that Phillips's truck was a safe distance behind Hawthorne's. Phillips also saw the horse "spook," raise its head and jump around; he testified that it then appeared to calm down again (in deposition, he said it calmed down "a little"). Phillips remained in his lane; he testified, however, that he would have, at that time, moved into the other lane had he not been approaching a curve and concerned there might be oncoming traffic. Only when the horse suddenly bolted toward the road did Phillips apply his brakes and swerve into the other lane. The horse crashed into the right side of the truck, in the middle of the highway. Both Murphy and the horse were killed.

DISCUSSION: LIABILITY
Fault of Murphy
Auger argues that Murphy's actions were the sole cause of the accident. Mrs. Murphy counters with five assignments that Murphy was without fault. We find that the record amply supports the trial court's conclusion that Murphy's negligent conduct contributed to this accident.
By her first assignment, Mrs. Murphy challenges the trial court's finding that her husband was negligent. Her fourth and fifth assignments specifically urge that the court erred in holding Murphy negligent for riding at a gallop with only a halter.
In support of her argument that Murphy was not negligent in riding the horse with only a halter, Mrs. Murphy cites the testimony of two witnesses that it was safe for him to do so. However, expert witnesses for both the plaintiff and defendant testified that the purpose of a halter is to lead, not ride, a horse; Murphy had been obliged to improvise reins by tying the lead rope in a knot under the horse's neck. The court noted that Sissy was accustomed to being ridden with a hackamore, a device which provides the rider with substantially more control than a halter. In support of its conclusion that Murphy acted negligently, the court cited Handy v. LeJeune, 341 So.2d 1386 (La.App. 3rd Cir.), writ denied 344 So.2d 671, 674 (1977), in which a rider was found contributorily negligent for riding a horse close to a highway with only a halter.
Mrs. Murphy argues that, even if a halter was improper equipment, its use was not a proximate cause of the accident because Murphy would have been unable to control the horse under these circumstances even if he had been riding with a hackamore. Mrs. Murphy's expert witness testified that once a horse is out of control, there is nothing the rider can do. However, Auger's expert testified that in all but the "most extreme" situations, proper equipment gives the rider greater control over the horse. He stated that Murphy may well have been able to steer the horse away from the highway had he been using a hackamore; with only a halter, he had no chance. The record supports the trial court's conclusion that a halter provides little control over a horse and is not intended as riding gear; the possibility exists that proper equipment could have led to a different result in this situation.
Mrs. Murphy further alleges that the trial court erroneously found Murphy negligent for galloping the horse. She cites Joyner v. Williams, 35 So.2d 812 (La.App. 2d Cir.1948), a pre-comparative fault case in which a rider travelling at a "moderate" pace was found free of negligence when his *448 horse was frightened by a motorist attempting to pass another vehicle on the two-lane road. Mrs. Murphy argues that the horse's speed made no difference to the outcome in this case. The record does not support this contention. The testimony is clear that a rider has less control over a galloping horse. Moreover, it was Murphy's custom always to walk his horses when he rode by the highway and nothing in the record indicates that he had any pressing reason to gallop home. In the context of arguing Phillips's negligence, Mrs. Murphy in brief describes the galloping horse as a "potential hazard." The weight of testimony supports the trial court's conclusion on this issue. We thus find no merit to these assignments.
In her second and third assignments, Mrs. Murphy urges that the court erred in finding Murphy negligent for riding the horse "12 to 18 feet north of the roadway," and in applying La.R.S. 32:22 and Mays v. American Indemnity Co., 365 So.2d 279 (La.App. 2d Cir.1978), writ denied 367 So.2d 392 (1979).
In its reasons for judgment, the trial court cited La.R.S. 32:22, which provides:
Every person riding an animal or driving any animal-drawn vehicle upon a roadway shall be granted all of the rights and be subject to all of the duties applicable to the driver of a vehicle by this Chapter, except those provisions which by their very nature can have no application.
The court then quoted from Mays:
We construe this [statute] to mean that he [horseback rider] is required to maintain control of his horse and prevent the horse from suddenly entering into the highway in the direct path of a speeding automobile. While we do not hold that a horserider is required to travel on any particular portion of the roadway or shoulder, we do find that he is required to ride his horse on the road which he is using in a manner to minimize to the maximum extent possible under the existing conditions, the possibility that the horse would become frightened and cause him to lose control of the animal and violate the duties imposed upon him by LSA R.S. 32:22. 365 So.2d at 284. La.R.S. 32:1(59) defines a "roadway" as "that portion of a highway improved, designed, or ordinarily used for vehicular traffic, exclusive of the berm or shoulder." "Highway" is defined as "the entire width between the boundary lines of every way or place of whatever nature publicly maintained and open to the use of the public for the purpose of vehicular travel, including bridges, causeways, tunnels and ferries; synonymous with the word `street.'" La. R.S. 32:1(25).
Mrs. Murphy argues that R.S. 32:22 and Mays are applicable only to horses ridden on the roadway. She claims that Murphy was not subject to the duties outlined in Mays because he was riding 12 to 18 feet off the roadway and that he was not negligent in doing so.
Strictly speaking, La.R.S. 32:22 applies only to horses ridden on a "roadway" as defined by the statute; thus a rider on the shoulder does not bear all the duties owed by a motorist. However, the statute cannot be construed to absolve a horseback rider of a duty of reasonable care just because he is off the paved portion of the highway. Mays correctly holds that whatever portion of the highway a horseman chooses to usepavement, shoulder or right of wayhe must do so in a manner to minimize the possibility that the horse may become frightened and bolt into the path of traffic on the roadway. This duty is not coextensive with R.S. 32:22, but is a reasonable corollary of it.
Mrs. Murphy cites Broussard v. Annaloro, 268 So.2d 293, 295-96 (La.App. 3rd Cir. 1972), which stated that the rider of a horse "on the shoulder or in the ditch adjoining a `roadway' is not subject to `all of the duties applicable to the driving of a vehicle,'" and Dotson v. Matthews, 480 So.2d 860 (La. App. 2d Cir.1985), writ denied 481 So.2d 1336 (1986), which cited this language. We do not disagree with these cases; however, they are factually dissimilar and presented very different legal issues than the instant case. We conclude that the duty imposed by Mays is the proper standard by which to *449 judge whether a rider off the road has exercised reasonable care to avoid creating a dangerous situation on the road in violation of R.S. 32:22. It was the Mays duty, rather than the statutory duty, which the trial court correctly found Murphy to have violated.
In reference to her claim that the court should not have found Murphy negligent for riding within 18 feet of the roadway, Mrs. Murphy again cites Broussard. There the court declined to find a defendant horserider negligent for riding between three and seven feet from the pavement. However, the Broussard accident occurred when a driver swerved to avoid the horse which he believed was heading for the roadway. The horse was apparently not out of control and never actually entered the roadway. The facts of this case more closely resemble those at issue in Mays, which found the rider contributorily negligent for riding some three feet from the "paved edge" of the road. While Murphy was riding considerably farther from the roadway than was the rider in Mays, that case nevertheless suggests that it may be negligent to ride a horse close to a busy road when a large grassy right of way is available. In the instant case, the trial court did not designate Murphy's choice of locations as an independent ground of negligence, but made reference to it in the process of determining the comparative fault of Murphy and Phillips. We find that the court did not err in considering this factor in making its determination.
Summarizing Murphy's actions (riding a hackamore-trained horse with a halter at a gallop), the trial court concluded that Murphy had failed to "minimize the possibility that the horse would become frightened and out of control" and was thus contributorily negligent. Murphy's failure to act reasonably off the roadway caused him to create a dangerous situation on the roadwaya situation which could easily have ended in tragedy for others, as it did for himself and his family. The finding that Murphy was at fault is not plainly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). Mrs. Murphy's assignments on the issue lack merit.
Fault of Phillips
Mrs. Murphy argues that Phillips should have been held negligent per se for driving too close behind Hawthorne's truck in violation of La.R.S. 32:81(B), which provides:
The driver of a motor truck, when traveling upon a highway outside a business or residential district, shall not follow another motor truck within 400 feet, but this shall not be so construed as to prevent one motor truck from overtaking and passing another.
Hawthorne and Phillips both testified that Phillips was following at a "safe" distance; nevertheless, the court found as fact that Phillips's truck was less than 400 feet behind Hawthorne's. However, in a well-reasoned duty/risk analysis, the court concluded that the risk "that one truck would spook a horse thereby causing it to bolt in front of a following truck" was not within the scope of the duty imposed by the statute. We agree with the trial court that the risk this statute was intended to avoid is that of a truck crashing into the rear of a preceding truck. The court did not err in declining to find Phillips negligent based solely on violation of this statute. See Laird v. Travelers Insurance Co., 263 La. 199, 267 So.2d 714 (1972).
In two assignments, Auger claims that the court erred in assessing any fault to Phillips.
In its discussion of Phillips's actions, the trial court cited the leading case of Plauche v. Consolidated Companies, 235 La. 692, 105 So.2d 269, 271-72 (La.1958), which sets out the duties of a motorist approaching a mounted horse on the highway:
[A motorist is] not required to reduce his speed at all when meeting or passing animal drawn vehicles or mounted horses on the highway unless he observes that the animal or animals are frightened or indicate in some manner that they are disturbed because of his presence. This is to say that a driver must not create any unusual situation, which might cause *450 nervousness or fright in such an animal. At the same time it must be realized that the action of a horse may not always be predicted with certainty. Persons with knowledge of the characteristics and dispositions of horses and who have had experience in handling them, know that regardless of their gentleness they never become absolutely immune from fright. With reference to the mounted horse and its rider, [a motorist] is under a like duty to exercise care with respect to a person riding a horse, and, if he sees or in the exercise of ordinary care should see that the horse is in a fretful and uncontrollable condition, it is his duty to use ordinary care to prevent his vehicle from further frightening the horse or colliding with him, and actually to stop his vehicle rather than to risk the most probable danger of collision by proceeding. [Citations omitted].
In its first assignment, Auger urges that the trial court erred in assessing fault to Phillips for failing to reduce speed before the horse became frightened. However, the court's opinion reveals that it based its finding on Phillips's conduct after, rather than before, the horse became frightened. This assignment thus lacks merit.
We are likewise unpersuaded by Auger's second assignment, in which it argues that the court erroneously found negligence in Phillips's conduct after the horse began to go out of control. Citing Plaucke, the trial court found that Phillips violated his duty of ordinary care, and thus was negligent, by failing to apply his brakes when he first realized the horse was "spooked." Phillips testified that he saw the horse spook when Hawthorne's truck approached it; it then appeared to Phillips that the horse had calmed down somewhat. Phillips stated that the horse then bolted into his path without any further warning. The trial court found as fact that the horse had first acted up, calmed down "a little" and then bolted.
From the moment he first saw that the horse was frightened and acting up, Phillips was on notice that the horse was in the "fretful and uncontrollable" condition described in Plaucke and that this condition was caused by the approach of Hawthorne's 18-wheeler. These circumstances imposed upon Phillips an affirmative duty to take reasonable steps to avoid further frightening the horse or colliding with it. Phillips admitted he was aware that Hawthorne's truck had frightened the horse in the first place; he could hardly have failed to realize that his own truck would have a similar effect on the horse. Phillips testified that he would have crossed into the eastbound lane when he first saw the horse spook had he not been driving in a slight curve that prevented him from clearly seeing any oncoming traffic; this proves that he was aware the horse was in trouble and that some evasive action was necessary at that time. Auger argues that if Phillips had applied his brakes, there would have been a noisy release of air which would have further frightened the horse; thus Phillips took the more prudent course by merely easing up on the accelerator. However, given the time between when the horse first began acting up and when it bolted into the road, the horse could not have calmed down significantly and immediate, decisive action on Phillips's part was required.
The court relied on eye witness accounts rather than the expert witnesses' reconstructions to determine pertinent times and speeds. In fact, the court specifically cited Phillips's testimony to the effect that he could have avoided the collision had he started braking from the first sign of trouble, an assertion consistent with Hawthorne's testimony that the horse was showing signs of distress before he passed it. The court was not clearly wrong in concluding that Phillips should have applied his brakes and brought his vehicle to a stop as quickly as possible when he first saw the horse spook.
Fault of Hawthorne
Both Auger and Mrs. Murphy urge that the trial court erred in failing to attribute a percentage of fault for the accident to the driver of the first truck, Bobby Hawthorne. However, based on this *451 record, the trial court's conclusion in this regard was not clearly wrong. Hawthorne testified that when he first observed the horse at a distance of some 250-300 yards, he began to lessen his speed without applying his brakes because, being familiar with horses, he was aware that a galloping horse might go out of control and he wanted to be able to stop if he had to. Hawthorne did not notice any particular problem with the horse until he was "almost on him." Hawthorne stated in deposition that he was approximately 15-20 yards from the horse when it "began to run sideways" a bit. As he passed the horse, which he could see was now completely out of control, he "eased" over slightly into the eastbound lane to straddle the center line.
Contrary to the arguments of both Auger and Mrs. Murphy, Hawthorne was under no duty to take evasive maneuvers until he observed the horse in a "fretful and uncontrollable condition." Plaucke, supra. He in fact began evasive action when he first observed the horse act up. While his knowledge of horses gave him greater awareness of potential problems than the average driver, his first clue of a problem came when he was approximately 60 feet from the horse. We do not believe that the statutory and jurisprudential duties imposed on drivers meeting horses on the highway demands that the driver take the risky step of moving into an oncoming traffic lane unless the horse is seen to be fretful and uncontrollable. It may be true that the approach of Hawthorne's truck frightened the horse. However, by simply driving within the speed limit in the correct lane on an open highway, Hawthorne did not violate his duty under Plauche to avoid creating any "unusual situation" which might frighten the horse. These assignments are thus without merit.
Comparative Fault
Both Auger and Mrs. Murphy allege that the court erred in its allocation of fault between Murphy and Phillips. Mrs. Murphy first argues that the court erred in finding as fact that Phillips had "no knowledge of horses and that they were likely to do the unexpected." This was not the court's precise finding; rather it noted that Phillips did not have an "intimate" knowledge of horses and their characteristics. This finding is supported by Phillips's uncontradicted testimony that he had watched people riding horses, but that he did not ride them himself or even like to get close to them. This assignment is thus without merit.
We also agree with the trial court's conclusion that Murphy's unquestioned expertise with horses subjected him to a higher standard of care than would apply to the average person. See Plauche, supra, and Watson v. State Farm Fire and Casualty Ins. Co., 469 So.2d 967 (La. 1985).
However, we find merit in Auger's assignment urging that the percentage of fault assigned to Phillips was too great. The factors to be considered in assigning relative percentages of fault are as follows: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson, supra at 974. The question of comparative fault is a matter of fact subject to the manifest error rule. Mohr v. State Farm Ins. Co., 528 So.2d 144 (La. 1988); Towns v. Georgia Casualty and Surety Co., 459 So.2d 124 (La.App. 2d Cir. 1984).
In its discussion of the comparative fault issue, the court noted specifically that Murphy not only rode Sissy with improper equipment, but also that up until the day of the accident she had been ridden with a hackamore. The court further noted that Murphy galloped the horse contrary to his own custom of walking a horse on the side of the highway, and that he failed to take advantage of the wide right of way to place further distance between himself and passing traffic. Based on these facts, the trial court found Murphy to be 60% at fault.
*452 We believe the record shows that Murphy played a much greater role in causing this accident than is reflected by the percentage of fault assigned by the trial court. In addition to the facts discussed above, we observe that Murphy chose to ride the horse beyond the entrance to his home. In brief, Mrs. Murphy suggests that he did so to train Sissy not to automatically turn in the driveway when she reached her "home." However, even if this was Murphy's reason for galloping past his house, the record contains no justification for his doing so under the existing circumstances. Murphy was aware that Sissy was accustomed to performing in an arena setting; galloping along the highway was unfamiliar to her. Moreover, there was no reason at all for Murphy to ride the horse on this occasion. Mrs. Murphy argues that her husband was dealing with an "emergency" situation and was forced to act as he did to avoid responsibility for a horse running loose on the highway. While Murphy was certainly under an obligation to retrieve the runaway horse, once Ginger Smith caught hold of Sissy's halter, the "emergency" ceased to exist. Either Ms. Smith or Murphy could easily have led the horse back to the house as Ms. Smith originally planned to do. There was no reason for anyone to ride the horse; galloping the horse so close to the road with only a halter as a means of control was manifestly unreasonable, particularly given Murphy's knowledge of horses.
In contrast, Phillips was indeed faced with an emergency situation not of his own making. True, he should have reacted immediately when he first observed the horse become frightened and disturbed and was obviously unjustified in believing the horse had calmed down enough to be fully under Murphy's control, but his level of negligence must be recognized as considerably less than Murphy's under these circumstances. He had little time to react from the first sign of trouble and though he could plainly see the horse was frightened and uncontrollable on the shoulder, there was nothing to indicate a collision was imminent until the instant the horse bolted into the road. See Plaucke, supra. Conversely, until the moment Sissy spooked, Murphy was in a position to make informed, reasonable choices. He did not do so.
We find that the trial court's allocation of fault was clearly wrong. As the foregoing discussion suggests, the Watson factors primarily weigh in Phillips's favor. We thus amend the judgment to reflect that Murphy was 75% at fault and Phillips 25% at fault for the accident.

DAMAGES
In three assignments, Mrs. Murphy challenges the general damages awarded by the court. First, she urges that the quantum of damages awarded to her and her children for loss of society is abusively low. We do not agree. The court awarded Mrs. Murphy $150,000, noting the very close relationship which she and her husband shared despite a brief separation. Our review of similar cases revealed awards for loss of society of a spouse ranging from as little as $7500 to a more recent award of $300,000; the figure awarded most frequently was $100,000. See, for example, Comberrel v. Basford, 550 So.2d 1356 (La.App. 5th Cir.), writ denied 556 So.2d 1284, 1285, 1286 (1990); Hellmers v. Dept. of Transp. & Development, 503 So.2d 174 (La.App. 4th Cir.), writ denied 505 So.2d 1141, 1149 (1987); Thomas v. State Farm Ins. Co., 499 So.2d 562 (La.App. 2d Cir.1986), writ denied 501 So.2d 213, 215 (1987). We cannot say that the award to Mrs. Murphy is abusively low. Reck v. Stevens, 373 So.2d 498 (La.1979). Similarly, testimony showing Murphy's "strong and healthy" relationship with his children persuaded the court to award the two children $140,000 each; this award, near the top of the range of awards to minor children reflected in the mass of similar cases, appears to be appropriate under these circumstances. Both of these awards reflect careful consideration of the facts and do not constitute any abuse of the court's much discretion.
Mrs. Murphy next contests the sufficiency of damages awarded for her husband's *453 pre-impact fear. We cannot dispute that Murphy experienced a terrifying realization that his horse was out of control and he was in the path of traffic. The court noted, however, that only a few seconds elapsed between the time Mr. Murphy realized he had lost control of the horse and the time of impact, after which Murphy remained unconscious until his death. Because of the trial court's emphasis on the brevity of the experience, the award of $7500, while on the low side, is not abusively low.
Mrs. Murphy also urges that the court erred in declining to award any damages for the emotional distress her daughter Kristi suffered as a result of seeing her father immediately following the accident. Damages for mental pain and anguish arising out of injury to another may be awarded to certain plaintiffs where the plaintiff proves he suffered severe and debilitating emotional injury. La. Civ.Code art. 2315.6; Lejeune v. Rayne Branch Hospital, 556 So.2d 559 (La.1990). See also Cloman v. Monroe City School Board, 572 So.2d 571 (La.1990). As distressing as Kristi's experience must have been, the instant record does not contain sufficient evidence to support a finding that the injury was both "severe and debilitating." The court thus properly disallowed this award.

CONCLUSION
For the reasons expressed, we amend the judgment to allocate 75% of the fault for this accident to George Raymond Murphy and 25% to K.D. Auger Trucking, Inc. The second paragraph of the amended judgment filed September 11, 1990 is amended to read as follows:
It is, THEREFORE, ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of SHELBY SUE MURPHY, INDIVIDUALLY AND AS NATURAL TUTRIX OF HER MINOR CHILDREN, JIMMY RAY MURPHY AND KRISTI MARIE MURPHY, and as against the defendants, K.D. AUGER TRUCKING, INC. and LOUISIANA INSURANCE GUARANTY ASSOCIATION, in solido, in the full amount of ONE HUNDRED FORTY-NINE THOUSAND NINE HUNDRED AND NO/100 ($149,900) DOLLARS, and as against the defendant, K.D. AUGER TRUCKING, INC., individually, in the full amount of TWENTY-THREE THOUSAND ONE HUNDRED SIXTY AND 66/100 ($23,160.66) DOLLARS, representing the total damages reduced by the proportion of fault attributable to the decedent, George Raymond Murphy; the award to bear legal interest thereon from date of judicial demand until paid, to be apportioned among the plaintiffs as follows:

Shelby Sue Murphy, Individually: $93,060.66
Shelby Sue Murphy, as natural
tutrix of the minor, Jimmy
Ray Murphy: $40,000.00
Shelby Sue Murphy, as natural
tutrix of the minor,
Kristi Marie Murphy: $40,000.00

All costs allowed by the trial court are assessed 25% to Auger and LIGA, and 75% to plaintiffs; costs of this appeal are assessed 25% to Auger, and 75% to plaintiffs. The judgment is otherwise affirmed.
AMENDED, AND AS AMENDED, AFFIRMED.
LINDSAY, J., dissents with assigned reasons.
SEXTON, J., dissents for reasons by LINDSAY, J.
LINDSAY, Judge, dissenting.
I agree with the majority that Mr. George Raymond Murphy was at fault in causing this accident. However, I am not persuaded that the defendant's truck driver, Mr. Prezell Phillips, acted unreasonably, or was at fault, under the circumstances presented in this case, or under the pronouncements in the Plaucke decision.
As pointed out by the majority, neither Mr. Bobby Hawthorne nor Mr. Phillips had any duty to take evasive action until they observed the horse in a "fretful and uncontrollable condition." Plaucke, supra. The issue is whether Mr. Phillips' actions, after observing that the horse was frightened, constituted fault.
*454 The first truck driver, Mr. Hawthorne, was familiar with horses and their behavior. Mr. Phillips did not have that knowledge or experience. Mr. Hawthorne, who had a better view of the horse and rider than did Mr. Phillips, testified that the horse was not out of control until Mr. Hawthorne was "right on him." Even then, the horse and rider were still in the middle of the grassy portion of the highway right-of-way. As Mr. Phillips approached, he moved his vehicle toward the center of the highway and reduced his speed. He could not move further to his left because he could not see whether there was any approaching traffic. At that time, the horse and rider were not on the traveled portion of the highway and Mr. Phillips had not perceived that the horse was out of control.
The plaintiffs' expert, Dr. Galli, testified that when Mr. Hawthorne's vehicle came upon the horse, Mr. Phillips had less than two seconds to react. During this time, Mr. Phillips perceived that the horse was out of control, slammed on his brakes, skidded for 78 feet and had completely moved his vehicle into the approaching traffic lane. The point of impact was on the center line of the highway, with the horse striking the right side of the truck. After Mr. Murphy lost control of the horse, there was not enough time for Mr. Phillips to bring his vehicle to a stop in order to avoid the accident.
Even if Mr. Phillips had been traveling 45 mph and had slammed on his brakes when Mr. Hawthorne's truck was passing the horse (a move which was not indicated at that moment), the accident would still have occurred. As to Mr. Phillips, the accident was unavoidable. See and compare McDonald v. Traylor, 170 So.2d 157 (La. App. 2d Cir.1964) and Dotson v. Matthews, 480 So.2d 860 (La.App. 2d Cir.1985).
Under the circumstances of this case, Mr. Phillips and the defendants should not be assessed with a percentage of fault. Accordingly, I respectfully dissent.