SCHOTT, Judge.
This suit arose out of an automobile accident which occurred on February 26, 1981. Plaintiff, Elizabeth A. Mohr, has appealed from the judgment dismissing her suit against defendants, Jerry Stelly, Keith Tra-han, Acme Truck Lines, Inc., and Fidelity and Casualty Company of New York. The judgment was entered in conformity with a special verdict returned by a jury following a lengthy trial. On appeal, plaintiff raises issues of fact and law concerning the jury’s allocation of fault, the employment status of defendant, Edmund G. Broussard, insurance coverage afforded by Fidelity and Casualty, and the quantum of damages awarded to plaintiff.
The accident occured on State Highway 23 in Plaquemines Parish. This highway runs north and south with two lanes on each side of a neutral ground. It was daylight at about 5:00 p.m., the weather was clear, and the road was dry. The speed limit was 55 miles per hour.
Prior to the accident Stelly, Trahan, and Broussard had delivered pontoons to a place south of the accident site. Stelly was operating a tractor and trailer rig containing twenty-two wheels and Trahan and Broussard were operating eighteen wheel rigs. The rigs were from fifty-five to sixty-five feet long. As they proceeded north with Stelly in the lead and Trahan and Broussard following they decided to go back to the vicinity of the delivery site in order to have a meal before returning to Lafayette which was several hours away. When they reached a turn around lane in the neutral ground Stelly and Trahan made their “U” turns, but as Broussard was in the process of making his with his trailer blocking both north-bound lanes, the left rear of the trailer was struck by an automobile driven by plaintiff.
Plaintiff had left her employer’s office south of the accident site and was proceeding north. When she was some distance away she saw the obstruction in the highway from the turning Stelly and Trahan *835 rigs but she was unaware that Broussard was going to follow them. When she saw Broussard’s truck blocking the road ahead of her she applied her brakes but struck the left rear of the rig in her right lane of traffic.
Stelly and Trahan were employees of Acme and were insured by Acme’s insurer Fidelity and Casualty. Broussard was insured by American Mutual Liability Insurance Company under a policy issued to H & H Rentals, Inc. Plaintiff originally joined Broussard, H & H and American Mutual as defendants but prior to trial she settled her case against them for American Mutual’s limits of $300,000 and dismissed her suit against them reserving her rights against the others. At trial plaintiff tried to show that the accident was caused by the joint negligence of Stelly, Trahan, and Brous-sard, that Broussard was functioning as an employee of Acme along with the others and that he was covered for liability by Acme’s insurer, Fidelity and Casualty.
In answers to written interrogatories the jury found that Stelly and Trahan were not negligent but that Broussard and plaintiff were, and the jury assigned sixty percent of the fault to Broussard and forty percent to plaintiff. Further, the jury found that Broussard was employed by Acme “at the time of the accident on February 26, 1981” but he was not in the course and scope of Acme’s business at the time and he was not driving a vehicle owned, leased, or borrowed by Acme. Finally, the jury found that $500,000 would fairly compensate plaintiff for her damages.
Many of plaintiff’s assignments of error are directed to the jury’s exoneration of Stelly and Trahan from liability for the accident. The main thrust of her arguments on this issue is that Stelly, Trahan, and Broussard were dispatched jointly to proceed in a caravan or convoy from Lafayette, where the pontoons were loaded, to the delivery point in Plaquemines. The evidence consists primarily of the testimony of Stelly and Trahan. Broussard did not testify. This evidence shows that the three did work and travel together and that they agreed with Trahan’s suggestion that they turn around on the highway and have a meal before returning to Lafayette. As Stelly and Trahan were making their turns Broussard parked his rig on the right shoulder waiting his turn to cross over. He pulled out from the shoulder and negotiated his tractor across both north bound lanes. As the tractor was entering the south bound side of the highway the left rear of his trailer which was just out of the north bound shoulder was struck by plaintiff’s car. At this point Stelly was a mile down the road and Trahan was likewise on his way south of the accident scene. There was no proof that Stelly or Trahan were directing, supervising, or controlling Brous-sard. At best from plaintiff’s point of view the evidence shows that the three were traveling together. But each one was solely responsible for the safe operation of his vehicle. When Broussard decided to leave the safety of the shoulder and negotiate his “U” turn he set into motion the operative facts causing the accident. The fact that Stelly and Trahan accomplished a similar maneuver in safety a few minutes before could not make them liable for Broussard’s failure to exercise reasonable care.
Plaintiff’s reliance on Lejeune v. Allstate Insurance Co., 365 So.2d 471 (La. 1978) is misplaced. There a deputy sheriff who was leading a funeral procession was held to be liable for the death of a passenger in the hearse which was struck by an automobile as the hearse crossed a favored street. The court found that the deputy breached a duty to secure the intersection. In the present case Stelly and Trahan had no duty to secure the highway in order for Broussard to make a “U” turn. We find no manifest error in the jury’s exoneration of Stelly and Trahan from negligence.
Next, plaintiff contends that Brous-sard was an employee or agent of Acme and was in the course and scope of his employment when he caused the accident. Acme was a common carrier supplying trucks, trailers and drivers for transportation of cargo. According to Stelly he got instructions on the day before the accident from James Wilkerson, a pusher or dispatcher employed by H & H, to pick up the *836 pontoons in Lafayette and to deliver them to Plaquemines Parish. He stated that his and Trahan’s trucks were owned by H & H and leased to Acme and that H & H’s dispatcher, Wilkerson, got a “percentage” from each haul Acme made for him.
Trahan testified that his truck was owned by H & H but he was employed by Acme. Asked whether H&H was his supervisor he stated that the only control H&H had over him was through its truck pusher. He recalled that Broussard, who had been an employee of Acme and operated an Acme truck, was driving a different truck on the day of the accident because his Acme truck had broken down. On cross examination Trahan stated that Broussard was driving an H & H truck, this was an H & H job, and he (Trahan) was dispatched by an H & H dispatcher.
John Sanchez, Vice President of Acme, testified that his company records reflected that Broussard was an employee of Acme in 1980 and from January, 1981 until August when he was terminated having earned over fourteen thousand dollars in 1981. When Broussard worked for Acme he was covered under its worker’s compensation policy. However, any Acme driver may work for another company when his Acme truck is out of service. Sanchez further testified on the day of the accident Broussard was originally under dispatch by Acme but his truck, which was owned by H & H and leased to Acme, was “broken down” and out of service. Company procedure required him to report this to the Acme dispatcher so that the latter could dispatch another truck to take the load. However, Broussard did not follow this procedure, but, instead, went directly to H & H and drove its truck.
Plaintiff depends upon this evidence to support two arguments: one, that Brous-sard was an employee or agent of Acme at the time of the accident; and, two, that he was covered under Fidelity and Casualty’s liability as an employee or, at least, because he was driving a truck dispatched by Acme or one which was substituted for a regular Acme truck. Thus, plaintiff contends that the jury committed manifest error in finding that Broussard was not in the course and scope of his employment by Acme at the time of the accident and the trial judge committed legal error when he concluded there was no coverage afforded to Broussard by Fidelity and Casualty.
This argument ignores the evidence produced by Acme consisting of the testimony of Harry Hardin and a number of documents. Prior to Hardin’s testimony there had to be confusion in the minds of the jurors as to the precise relationships among Acme, H&H, and the drivers. However Hardin, who emerges from the transcript as an informed, knowledgable and credible witness, cleared up this confusion. Undoubtedly the jury assigned credibility and great weight to his testimony.
Hardin was a past owner or shareholder and officer of the H&H corporation. He testified that H & H is a drilling equipment rental company and owned three pontoons which were leased to Southland Seismic Company. Southland contacted H & H to deliver the pontoons from Lafayette to Plaquemines. Since three trucks were required for the job and H&H had only one available, H&H hired two Acme trucks for the project. H&H has never leased any trucks or trailers to Acme. Broussard came to work for H & H shortly before the date of the accident. This was not the first time he worked for H&H. He had been working for Acme but the truck assigned to him was out of service so he applied for a job once again with H&H. Hardin produced payroll records showing that Broussard was paid by H & H for the week ending February 27, 1981 which included the day of the accident. At this point in time Broussard worked for H & H for seven or eight days. Other payroll records show he worked for H & H on other occasions. Hardin also produced a work order turned in by Broussard to H & H covering his services on the day of the accident and showing that H&H was paid for hauling one truck load for Southern Seismic. Hardin stated that Broussard did not and could not borrow an H & H truck to substitute for an Acme truck. He explained that H & H had no license or permit to haul anything for others and could only haul equipment *837 which it owned such as the pontoon in this case. Hardin was also emphatic in his denial that Acme’s name was on Broussard’s truck as plaintiff’s witness Ledet stated.
Hardin stated that he was also a part owner or shareholder and officer of another company called Hardin Truck Lines which did own and lease three trucks to Acme including the two being operated by Stelly and Trahan. Under the lease agreement Hardin Truck receives a percentage of the amounts Acme is paid for the use of the trucks. But Hardin Truck is a completely separate company from H & H and Hardin Truck had nothing to do with the vehicle Broussard was driving at the time of the accident.
Considering the entire record it cannot be said that the jury committed manifest error in deciding that Broussard was an employee of Acme but was not in the course and scope of employment by Acme at the time of the accident. The jury’s obvious conclusion was that Broussard was a regular but occasional driver for Acme, and he also worked for H & H during the same general period. But at the time of the accident he was functioning strictly and solely as an employee of H & H, dispatched and controlled by it, driving its truck, paid by it, and insured by its liability insurer.
The same evidence likewise supports the trial judge’s conclusion that Broussard was not insured by Fidelity and Casualty, Acme’s insurer. Plaintiff’s principal theory, that Broussard was “under dispatch” by Acme, is not supported by the evidence. Plaintiff relies upon the following questions and answers from the testimony of John Sanchez to support her theory:
Q. The morning of February 26, 1981, Broussard was working for Acme, wasn’t he?
A. He was dispatched.
Q. So he had to be?
A. He was dispatched, the truck he was driving was dispatched by Acme.
When this testimony is read in context with previous testimony given by Sanchez it becomes obvious that the quoted testimony is inaccurate. Just before the quoted testimony Sanchez had stated that Broussard was not driving an Acme truck that day because his Acme truck was out of service. Asked whether Broussard was “under dispatch for Acme that morning until his truck broke”, Sanchez replied:
No, Let me reiterate what I said before the driver is not dispatched, the truck is dispatched. So when the truck broke down Mr. Broussard should have informed dispatch to dispatch another truck.
A complete reading of the Sanchez testimony shows that this witness did not have a clear understanding of Broussard’s status on this morning as Hardin did. If there are any conflicts in the testimony of these witnesses the jury resolved them in favor of Hardin and we agree with that conclusion.
On the basis of the testimony of Stelly, Trahan, and Sanchez, it may be that plaintiff made a weak prima facie case for insurance coverage on Broussard by Fidelity and Casualty on the theory that the H & H rig being driven by Broussard was a substitute for the broken down Acme rig he had been driving. But the testimony of these witnesses was vague and uncertain and included the somewhat implausible scenario that Broussard discovered on the morning of the accident that his Acme truck was disabled and he took it upon himself to borrow a truck from H & H to accomplish a mission for Acme. This is particularly implausible in the light of Sanchez’s testimony that Acme “had no shortage of trucks at the time because the truck count was around thirteen hundred.” In any event Hardin’s testimony totally dispelled the notion that the H & H truck became a substitute in Acme’s fleet.
In one of her assignments of error plaintiff contends that the trial court erred in allowing the jury to hear Hardin’s testimony. In support of this argument plaintiff asserts that Acme contrived to produce Hardin by means of a bogus subpoena. The fact is that Hardin was in court, he was sworn as a witness, and the jury was entitled to hear and evaluate his testimony. *838 Neither law nor equity supports this argument which would prevent the jury from getting the relevant facts in the case.
Plaintiff challenges as manifestly erroneous the jury’s conclusion that she contributed forty percent of the fault for the accident. A reading of the entire record amply supports the jury’s finding. The investigating officer measured 167 feet of skid marks to the point of impact. From this, a defendant’s team of experts estimated she could not have been traveling less than seventy miles per hour when she applied her brakes. They further stated that had she been traveling within the fifty-five mile limit she could have stopped within one hundred and twenty-three feet. Plaintiff’s attack on the findings of the investigating officer because he was admittedly inexperienced was strictly a matter for the jury to consider. Similarly it was the jury’s function to decide whether to believe defendant’s expert or plaintiff’s who testified that his studies indicated she was going within fifty-five when she applied her brakes. Defendant’s excessive speed was also attested to by witnesses Jessie Ledet (called by plaintiff) and Roland Leonard who were both proceeding in the direction of the accident site and were both passed on the highway by plaintiff just before the accident when Ledet was traveling fifty-five to sixty miles per hour and Leonard, sixty to sixty-five. Finally, plaintiff’s own testimony convicts her of some fault. She stated that she first saw the road blocked by something and after it cleared she began to accelerate again; she made some adjustment on her sun visor and suddenly the truck was in front of her; but she didn’t see the Broussard truck as it crossed in front of her. The jury apparently concluded that she was at fault for speeding and failing to see what she should have seen. This conclusion is not manifestly erroneous.
The foregoing discussion is dispositive of many of plaintiff’s specifications of error which charge the jury with manifest error in findings of fact. Plaintiff specified a number of additional errors not heretofore discussed. For one, plaintiff contends the trial judge erred in failing to give special jury charges which she requested. These charges from the Restatement of Torts, 2d, have to do with plaintiff’s “caravan” theory of liability. Unfortunately, the record does not contain a transcript of the jury charges, and, it appears that the charges were not taken by the court reporter. A minute entry shows that the jury was charged on April 26, 1984, but the entry does not provide the substance of the charges. Thus, we are unable to evaluate this specification on the basis of whether or not the general instructions were sufficient to appraise jury of the applicable law on this point. However even when the appellate court is confronted with acknowledged errors in jury instructions the remedy is for the court to decide the case on the record. Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975). Thus, whether the jury was correctly instructed or not on this point matters little. From our review of the record the “caravan” theory has no application. The three trucks were not under the direction of a common employer to travel in a caravan and Stelly was not the leader or supervisor of the group. Stelly and Trahan breached no duty owed by them to Brous-sard or to plaintiff concerning Broussard. Broussard was under a duty which was entirely independent and unrelated to Stelly and Trahan to operate his vehicle safely and it was this duty which he breached. The allocation of sixty percent of the fault to Broussard and none to Stelly and Trahan is amply supported by the record.
Plaintiff also specifies other errors growing out of deficiencies in the record and transcript. She recounts some thirty defects consisting of missing minute entries, objections, arguments, rulings, and other events. After the record was lodged in this court the case was remanded to the trial court for correction of the record. The trial judge conducted a hearing and meticulously analyzed each of plaintiff's arguments. In almost all of these instances plaintiff does not disclose the content of the missing material and she fails to show how she was prejudiced by their absence from the record except for one item from *839 closing argument by Acme’s attorney which will be discussed below.
Three of plaintiff’s specifications of error arise out of the trial court’s ruling that the compromise agreement she made with Broussard, H & H and American Mutual was admissible and allowing the document to be examined by the jury. Plaintiff settled her case with these parties for $300,000,00 which was the limit of American Mutual’s policy on H & H. The settlement agreement provided that if plaintiff made additional recoveries from the other parties American Mutual would be reimbursed up to $100,000.00. Originally the trial court ruled in limine that this agreement was inadmissible. During the trial he reversed his ruling because plaintiff, while on the witness stand, testified she was on the verge of bankruptcy. The trial judge reasoned that the payment of $300,000.00 to plaintiff was admissible to impeach her testimony. However, plaintiff offered to stipulate the payment and contends she was prejudiced by the jury’s being able to study the document. Furthermore, during closing argument, Acme’s attorney waved the document before the jury and asked if anyone could believe that H & H and its insurer would give plaintiff $300,000 if Broussard wasn’t their employee and insured. Plaintiff argues that her case against Acme as Broussard’s employer was sorely prejudiced by this tactic.
We agree with plaintiff that the trial court erred in admitting the agreement and allowing it to be shown to and discussed in argument before the jury. However, we consider the error to be harmless. On liability the evidence that Broussard was H & H’s and not Acme’s employee was overwhelming. We are convinced that the jury would have reached the same conclusion had the compromise agreement been excluded.
By her final specification of error plaintiff contends she was prejudiced because the jury foreman’s wife attended the trial as a spectator. The trial judge conducted a post trial hearing at which the lady testified she did not know any of the jurors, did not speak to any of them during the trial, and did not discuss anything with her husband concerning the trial while it was in progress. Plaintiff offered no evidence to contradict or discredit this testimony. We find no error in the trial judge’s determination that plaintiff failed to show that the lady influenced her husband or any of the jurors concerning the case.
Having considered all of plaintiff’s specification of drror and argument in the light of the evidence we have resolved to affirm the judgment of the trial court on liability and turn now to the question of quantum.
Since we have affirmed the dismissal of plaintiff’s suit against the present defendants it may seem unnecessary to address the quantum. However, if plaintiff is entitled to more than the $300,000 for which she settled her case against Broussard, H & H, and American Mutual she may be able to recover from State Farm Mutual Automobile Insurance Company. This is the subject of a separate appeal and judgment being rendered this date under number CA-3447 on the court’s docket, 515 So.2d 840.
The last interrogatory to the jury was: What amount of damages will fairly compensate Elizabeth A. Mohr for past, present, and future physical pain and suffering, past, present, and future loss of wages, and past, present and future medical expenses resulting from the accident of February 26, 1981?
The jury answered $500,000.00. The trial judge in reasons for judgment in plaintiff’s companion case against State Farm, as well as the parties to this case, interpreted the jury’s verdict to mean that the total damages amounted to $500,000 of which plaintiff was entitled to $300,000 based upon her own forty percent degree of contributory fault. We are not at all certain that this was the jury’s intention. In any event, plaintiff’s damages exceed $500,000 to the extent that if that is all the jury intended to award subject to reduction by forty percent the award constitutes an abuse of discretion.
Plaintiff was born on January 14, 1955. She was trained and educated as a school *840 teacher and taught for a time until she changed careers and started working for Sims Welding in September 1979 as officer manager. At the time of the accident she was earning $1,600 per month with a raise of $100 per month scheduled for March 1. Her employer, Nathan Sims, testified that she had expanded the scope of her duties from initially supervising three clerical employees and keeping the company’s books to installing a computer system and taking on a number of additional responsibilities. Sims regarded her as an intelligent, energetic, and imaginative employee and expected her to be earning $2,150 by September 1,1981 and $2,600 by February 1,1982. She had participated in sports and trained horses prior to the accident. She suffered severe injuries in the accident. At trial time she had incurred medical expenses of $146,722 and offered evidence of future medical expenses of over $276,000. She had undergone fifteen hospitalizations and surgeries and had been treated by over thirty physicians. She is left with permanent problems including orthopedic disabilities, traumatic epilepsy, gynecological and psychiatric problems, vision impairment, dizziness and imbalance, and scarring. That she will incur medical expenses for the rest of her life cannot be disputed. Equally certain is the fact that she has suffered a substantial loss of earnings and earning capacity.
Plaintiff called Dr. Seymour Goodman, an economist, to testify as to her economic loss. On direct examination, using salary figures which included the raises Sims anticipated, he calculated past loss wages to be $93,664 and future losses to be $627,380. He also computed future psychiatric expenses to be $56,000 and future drug expenses to be $191,000. When furnished with more conservative assumptions by one of the defense counsel including the prospect that plaintiff could later secure employment paying her $1000/$1200 per month, Dr. Goodman estimated past lost wages at $68,000 and future losses at $164,000. Assuming her future medical expenses would approximate $5,000 per year he estimated future medical expenses would exceed $74,000.
From these figures we find plaintiff has sustained at least $500,000 in damages for past and future medical expenses and past and future loss of earnings. This would be the lowest the jury could award within its discretion for special damages.
Considering that plaintiff was a bright, attractive, energetic, and able twenty-five year old (at trial time) woman whose life has been shattered by this accident the lowest amount the jury could award within its discretion for general damages was $500,000.
Since a total of $1,000,000 is the lowest figure the jury within its discretion could have placed on her damages, plaintiff is entitled to recover $600,000 together with interest from date of judicial demand until paid and all costs of these proceedings subject to a credit of $300,000 she received in settlement on December 3, 1982.
JUDGMENT AFFIRMED
JURY VERDICT AMENDED.