RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0340p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

SANDRA L. RUPERT, Special Administrator of
the Estate of Ivan L. Rupert, Jr., deceased,
                              *Plaintiff-Appellant*,

                    *v.*

FREDA DAGGETT, doing business as KFDGT
Pilot Car Services,

                              *Defendant - Appellee*.

No. 11-1134

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:09-cv-221—Gordon J. Quist, District Judge.

Argued: April 13, 2012

Decided and Filed:  September 19, 2012

Before:  WHITE, STRANCH, and FARRIS, Circuit Judges.[*]

_____

## COUNSEL

**ARGUED:** Scott R. Melton, GRUEL, MILLS, NIMS & PYLMAN, LLP, Grand Rapids, Michigan for Appellant.  Daniel S. Saylor, GARAN LUCOW MILLER, P.C., Detroit, Michigan, for Appellee.  **ON BRIEF:** Scott R. Melton, William F. Mills, GRUEL, MILLS, NIMS & PYLMAN, LLP, Grand Rapids, Michigan for Appellant.  Roger A. Smith, Caryn A. Gordon, GARAN LUCOW MILLER, P.C., Detroit, Michigan, for Appellee.

---

[*]The Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

1

---

**OPINION**

---

JANE B. STRANCH, Circuit Judge.  Michael Otteren was driving behind his travel companion, Freda Daggett, when Daggett made an illegal U-turn.  As Otteren repeated Daggett's U-turn, his vehicle cut off a motorcycle being driven by Ivan Rupert, resulting in his death.  His widow, Sandra Rupert, sued Daggett under the theory that the accident was a reasonably foreseeable result of Daggett's own negligence because she knew Otteren was following her.  The district court granted summary judgment to Daggett upon holding, under Michigan law, that Otteren's operation of his own vehicle constituted a superseding, intervening cause that cut off any liability on Daggett's part.  Because we conclude that Sandra Rupert raised genuine issues of material fact as to each element of the prima facie negligence case, we **REVERSE** the judgment of the district court.

## I.  BACKGROUND

Freda Daggett and Michael Otteren each owned and operated "pilot vehicles," which escort trucks hauling large or wide loads across the country.  Daggett drove a Chevrolet S-10 pickup truck, while Otteren drove a GMC Suburban.  At the time of the accident, Daggett was the far more experienced of the two and had been driving commercial trucks since 1983, logging approximately 400,000 miles as a pilot car driver.  She is the owner and sole employee of KFDGT Pilot Car Services, a company she started in 2001.[1]  Otteren had been driving a pilot vehicle for about nine months before the accident for his own company, AAA Pilot Car Service.  They were acquainted through Otteren's father, a truck driver with whom Daggett had worked, and Daggett had provided some instruction to Otteren about how to operate a pilot car.  Sandra Rupert

---

[1] The acronym stands for "Kermit Frog's Done Gone Trucking," which is a reference to Daggett's nickname, "Froggy."

alleges that Daggett and Otteren had a mentor-mentee relationship, but the exact nature and degree of their association is not entirely clear from the record.

The chain of events giving rise to this case began when Daggett accepted Otteren's invitation to work with him on a multi-trip project escorting loads from Michigan to California, although they traveled separately. Upon reaching their final destination, both drivers hoped to find a job which would pay them to travel back across the country but, upon being unsuccessful in their pursuits, decided to drive back to Michigan together without a load to accompany.**2** As they headed east on Interstate 70, they were in regular communication over CB radio and stopped together at the same locations.

On March 17, 2007, Daggett and Otteren were continuing eastward on the interstate through Colorado, with Daggett in the lead, when they decided to take an exit so Otteren could fix one of his mirrors. Upon discovering there was not an eastbound on-ramp to get back on to the interstate, they agreed to take the westbound ramp instead. During her deposition, Daggett testified she did not recall whether they had further discussion about their route, although she did agree the "plan" was to "[f]ind a place to turn around and go back eastbound." Meanwhile, Ivan Rupert was approaching the exit on his Harley Davidson motorcycle from the westbound portion of the interstate.

Laura Perri, a witness to the accident, was driving in the right lane of the two lanes constituting the westbound portion of the interstate when she saw Daggett, and then Otteren, attempting to merge into that lane from the on ramp. She detailed the subsequent events in an affidavit as follows:

> The two pilot vehicles entered Interstate 70 westbound at the Grand Mesa-Collbran entrance. There is a cement divider between the westbound and eastbound lanes of traffic when one enters the interstate at that point. I passed the pilot cars as they merged onto the interstate or shortly afterwards. The motorcycle driver was behind the trailing pilot vehicle in the right lane and signaled his intention to move into the left

**2**Daggett explained they drove together because "we were at the same place at the same time." Otteren stated: "It makes sense. That way if somebody gets a flat tire or something happens, you've got someone you know along the way to at least help out."

lane and then moved into the left lane.  The two pilot cars were still in the right lane and were slightly ahead of the motorcycle.  I was looking in my rear view mirror so I would be  able to safely move from the left lane to the right after I passed the lead pilot vehicle.  The trailing  pilot vehicle was one and half to two car lengths behind the lead pilot vehicle.[3]  The motorcycle was five or six car lengths behind my vehicle.

I had just passed the lead pilot car when suddenly, the lead pilot car made an abrupt left turn from the west bound right lane, crossing over the westbound left lane into the median at the U-turn access point designated for authorized and emergency vehicles only.  The trailing pilot vehicle followed the lead pilot vehicle, executing the same maneuver, turning left from the right hand westbound lane cutting across the westbound left lane behind the lead SUV pilot vehicle.[4]  Neither pilot vehicle activated its yellow roof lights or turn signals.

Perri described the angle taken by the pilot vehicles as a sharp perpendicular[5] turn with "no merging to the left lane at all."  Daggett was able to proceed through the median without incident, but Ivan Rupert's motorcycle struck the right rear corner of Otteren's vehicle as their paths intersected.  Rupert died as a result of his injuries.  Just one mile from the accident site was an exit which would have allowed Daggett and Otteren to reenter the interstate on its eastbound side without taking a U-turn.

Otteren offered a different account of the facts.  He testified to seeing Rupert's motorcycle about 300-350 feet behind him when he first saw it through his rearview mirror and said Daggett's vehicle was "a good quarter mile or so" in front of him.  He recalls traveling completely in the left lane for about one quarter to one half of a mile for twenty to thirty seconds before deciding to turn into the median, at which time he slowed down and turned on his overhead and rear flashing lights, "which is standard procedure when we're doing pilot car work if you're going to turn around in the median."

---

[3]During her deposition, Perri stated that the pilot vehicles "were literally right behind tailgating each other."

[4]During her deposition, Perri stated that the second pilot vehicle "did an immediate [turn]" following the turn of the first vehicle.

[5]Although Perri used the word "parallel," it seems clear from the context and a subsequent question that she intended to say "perpendicular."

Sandra Rupert submitted an affidavit by Robert Caldwell, an experienced accident reconstruction expert, which stated that the description of events provided by Otteren is "unlikely" for two reasons. First, the vehicle damage indicates Otteren "had to be at a substantial angle to the roadway . . . consistent with a sudden decision to make the dangerous U-turn." Second, the visibility of the median crossover is "extremely limited" from the westbound direction because it is located "immediately after" a guardrail installation. As a result of these findings, Caldwell concluded: "Ms. Daggett made an abrupt maneuver, crossing from the outermost, right hand lane, to the median crossover, followed immediately by Mr. Otteren. This resulted in a left turn immediately in front of Ivan Rupert."

Although neither Otteren nor Daggett were ticketed for an illegal U-turn, Otteren was charged with and convicted of careless driving causing death or injury, for which he was sentenced to six months in jail. During his sentencing hearing, Otteren made the following statement about why he attempted to take the U-turn:

> I made a bad decision. I didn't do it on purpose. I didn't say, hey, there's a guy on a motorcycle, watch this. I just—I made a bad decision. You know, Freda [Daggett] said on the radio, let's make—let's take the U-turn. Let's take the turnaround. With the type of work we've done, I've worked with her, she has been kind of teaching me how to do—she was teaching me how to do pilot car work. And with our work, we do it quite often, so I didn't even give it a second thought. I thought I had plenty of room.

Similarly, he stated during his deposition: "[Daggett] had stated over the radio that there was a turnaround ahead and that we could use it. . . . I guess under that suggestion, we thought we'd use it." However, he also took full responsibility and testified it was solely his decision to make the turn and that Daggett did not order, direct, or supervise the turn and was thus not responsible for his actions.

On March 12, 2009, Sandra Rupert initiated this diversity action against Daggett on behalf of herself and her late husband's estate. Daggett filed a Motion for Summary Judgment, which was granted by the district court. *Rupert v. Daggett*, No. 1:09-CV-221, 2010 WL 4553650 (W.D. Mich. Nov. 3, 2010). In its Opinion, the court first ruled that

under the choice-of-law rules of the forum state, Michigan, the substantive law of Michigan should apply. Next, the court found that Sandra Rupert could not establish proximate cause as a matter of law because Otteren's negligent driving constituted a superseding cause which cut off all liability on the part of Daggett. In response to Sandra Rupert's Motion to Reconsider, which argued that the court failed to view the facts in the light most favorable to her, the court held that its original superseding cause determination was not dependent on how abruptly Otteren made his decision or how closely he was following Daggett. Sandra Rupert filed a timely appeal.

## II.  DISCUSSION

### A.        Standard of Review and Applicable Law

This court reviews a district court's grant of summary judgment de novo. *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 551 (6th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In reviewing the record, we view the factual evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in that party's favor. Ultimately, the proper inquiry is whether the state of the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Slusher v. Carson*, 540 F.3d 449, 453 (6th Cir. 2008) (citations omitted).

Federal courts sitting in diversity generally apply federal procedural rules and the substantive law of the forum state. *City of Cleveland v. Ameriquest Mortg. Sec., Inc.*, 615 F.3d 496, 502 (6th Cir. 2010). Although both parties mention Colorado law in their briefs, neither party has challenged the district court's determination that Michigan substantive law applies. Thus, we apply Michigan substantive law in accordance with the currently controlling decisions of Michigan's highest court. *See Metz v. Unizan*

*Bank*, 649 F.3d 492, 496 (6th Cir. 2011).  In the absence of such decisions, we may also look to Michigan's lower courts to predict how its highest court would resolve an issue. *See Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co.*, 598 F.3d 257, 264 (6th Cir. 2010).

**B.        Negligence**

The Michigan Supreme Court has established that "[i]n order to make out a prima facie case of negligence, the plaintiff must prove the four elements of duty, breach of that duty, causation, and damages." *Brown v. Brown*, 739 N.W.2d 313, 316–17 (Mich. 2007) (citing *Fultz v. Union-Commerce Assoc.*, 683 N.W.2d 587, 590 (Mich. 2004)). We conclude that disputed issues of material fact exist upon which a reasonable jury could find for Sandra Rupert as to each element.

**1.        Duty**

"The threshold question in a negligence action is whether the defendant owed a duty to the plaintiff." *Id.* at 317 (quoting *Fultz*, 683 N.W.2d at 590).  "Duty is essentially a question of whether the relationship between the actor and the injured person gives rise to any legal obligation on the actor's part for the benefit of the injured person." *Id.* (quoting *Moning v. Alfono*, 254 N.W.2d 759, 765 (Mich. 1977)).  Several factors are instructive in determining whether to impose a common-law duty:

> (1) the relationship of the parties, (2) the foreseeability of the harm, (3) the degree of certainty of injury, (4) the closeness of connection between the conduct and injury, (5) the moral blame attached to the conduct, (6) the policy of preventing future harm, and, (7) finally, the burdens and consequences of imposing a duty and the resulting liability for breach.

*Rakowski v. Sarb*, 713 N.W.2d 787, 795 (Mich. Ct. App. 2006) (quoting *Buczkowski v. McKay*, 490 N.W.2d 330, 333 n.4 (Mich. 1992)) (punctuation omitted).  "The inquiry is ultimately a question of fairness involving a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." *Id.* (citation and internal quotation marks omitted).

Daggett argues that, under Michigan law, there is generally no duty to aid or protect an individual who is endangered by the conduct of a third person unless a special relationship exists between the plaintiff and defendant. *See Williams v. Cunningham Drug Stores, Inc.*, 418 N.W.2d 381, 383 (Mich. 1988). A special relationship exists when "one person entrusts himself to the control and protection of another, with a consequent loss of control to protect himself." *Id.* Because there was no special relationship between the plaintiff and defendant in this case, Daggett asserts, Daggett had no duty to protect the decedent from Otteren. Although perhaps accurate, this argument misses the point here.

As Sandra Rupert rightly observes, her claim is not that Daggett failed to protect the decedent from Otteren's negligence but rather that Daggett herself was negligent in the operation of her automobile, and that Daggett's own negligence caused the accident. Thus, Sandra Rupert need only show that Daggett owed a duty of reasonable care to the decedent, not that she had a duty to the decedent to protect him from Otteren's actions. We have little difficulty finding the duty element satisfied here because "Michigan law imposes on all motorists a general duty to operate their vehicles in a reasonably prudent manner." *Sponkowski v. Ingham Cnty. Rd. Comm'n*, 393 N.W.2d 579, 581 (Mich. Ct. App. 1986) (citing *Zarzecki v. Hatch,* 79 N.W.2d 605, 607 (Mich. 1956)); *see also* Mich. Comp. Laws § 257.653(2) (providing that drivers of emergency vehicles are not relieved "from the duty to drive with due regard for the safety of persons using the highway"). This duty is owed to other motorists and pedestrians. *McCuish v. Jaffe*, No. 286807, 2009 WL 3050900, at *1 (Mich. Ct. App. Sept. 24, 2009) (citing *Zarzecki,* 79 N.W.2d at 607; *Poe v. Detroit*, 446 N.W.2d 523, 527 (Mich. Ct. App. 1989)). "While a motorist is not required to guard against every conceivable result of his actions, he is required to exercise reasonable care in order to avoid the foreseeable consequences of his actions. In addition, the determination of whether a particular harm is foreseeable is an issue for the trier of fact in deciding if the defendant has been negligent." *Sponkowski*, 393 N.W.2d at 581 (citing *Davis v. Thornton*, 180 N.W.2d 11, 15–16 (Mich. 1970)).

Michigan also recognizes the voluntary assumption of duty doctrine. "A party may be under a legal duty when it voluntarily assumes a function that it is not legally required to perform." *Zychowski v. A.J. Marshall Co., Inc.*, 590 N.W.2d 301, 302 (Mich. Ct. App. 1998). "When a person voluntarily assumes a duty not otherwise imposed by law, that person is required to perform it carefully, not omitting to do what an ordinarily prudent person would do in accomplishing the task." *Zine v. Chrysler Corp.*, 600 N.W.2d 384, 395 (Mich. Ct. App. 1999) (citation and internal quotation marks omitted).

In *Sponkowski*, the Michigan Court of Appeals applied the voluntary assumption of duty doctrine to a driver who agreed to lead the way for others. There, the defendant was the lead driver in a caravan of vehicles operated by persons who were unfamiliar with the route to the intended destination. After the leader lost control of his vehicle at a sharp turn and drove off the road, one of the trailing vehicles did the same. The plaintiff's decedent was a passenger in that trailing vehicle and was killed when the car struck a tree. *Id.* at 580. Overruling the trial court's grant of summary judgment for the defendant for lack of duty, the Michigan Court of Appeals held the leader's knowledge of the following drivers' reliance on him "gave rise to a duty . . . to drive reasonably in light of the apparent risk to all those relying upon him, of which [the decedent] was one. Injury to [the decedent] is within the foreseeable risk of harm created by defendant's alleged negligent conduct." *Id.* at 581.

Similarly, Daggett and Otteren had an understanding that Daggett would lead the way with the "plan" of returning to the eastbound portion of the interstate. Drawing all inferences in Sandra Rupert's favor, a jury could reasonably find that the agreement made it foreseeable to Daggett that any careless driving on her part would be followed by Otteren and result in additional danger to other motorists, particularly in light of the close proximity in which Daggett and Otteren were allegedly driving. Accordingly, we conclude that Daggett is not entitled to summary judgment as to the element of duty.

## 2.      Breach

"It is well-settled that a u-turn is one of the most dangerous maneuvers in which a motorist can indulge and that he must make sure that such a maneuver can be accomplished without danger to traffic to his left or rear." *Langhoff v. United States*, 805 F.Supp. 2d 272, 276 (E.D. La. 2011) (citing *Cory v. Emp. Mut. Liab. Ins. Co.*, 267 So.2d 761, 764–65 (La. Ct. App. 1972)).  Not only did Daggett undertake a U-turn from one side of the interstate to the other, we must assume for purposes of summary judgment that she did so suddenly across two lanes of traffic.  Moreover, construing the facts in favor of Sandra Rupert, a reasonable jury could find that Daggett's decision to make a U-turn on the interstate while Otteren was following her created a foreseeable risk of danger to other motorists.  We thus conclude that Daggett is not entitled to summary judgment on the element of breach.

## 3.      Causation

In order to establish causation, a plaintiff must prove two elements: (1) cause in fact and (2) proximate cause.  *Skinner v. Square D Co.*, 516 N.W.2d 475, 479 (Mich. 1994).   "The cause in fact element generally requires showing that 'but for' the defendant's actions, the plaintiff's injury would not have occurred."  *Id.*  With respect to this element, Daggett argues there is "absolutely no evidence from which a jury could conclude that, more likely than not, but for Daggett's conduct (i.e., using the median as a turnaround) the injury would not have occurred."  However, Otteren stated during his deposition that he would have "[m]ore than likely" followed Daggett further westward had she decided not to take the U-turn because "I see no reason why we would separate." A reasonable jury could find Daggett's conduct satisfies the cause in fact element. Whether Daggett's driving was the proximate cause of the accident, however, is a more complicated issue and the one on which the district court erred in granting summary judgment to Daggett.

The Michigan Supreme Court recently clarified the governing standard for proximate cause:

> Proximate causation involves examining the foreseeability of consequences and whether a defendant should be held legally responsible for such consequences given his negligent acts or omissions. This Court has defined proximate cause as "a foreseeable, natural, and probable cause." Such causation is distinct from factual or "but for" causation, and issues of proximate causation thus call for an independent, searching inquiry, the focus of which is whether the result of conduct that created a risk of harm and any intervening causes were foreseeable. Probability of harm is thus a relevant consideration to determine whether the defendant's conduct was foreseeable or if the defendant should be held legally liable in light of the circumstances. Since there are risks that can be foreseen but would not be avoided by a reasonable person, for liability to attach the harm must be of a kind that defendant should have avoided or it must be shown that defendant's actions presented an unreasonable risk of harm.

*Jones v. Detroit Med. Ctr.*, 806 N.W.2d 304, 305 (Mich. 2011) (order) (citations omitted). If an intervening force is not reasonably foreseeable under an objective standard, it constitutes a "superseding cause" which relieves a prior negligent defendant from liability. *Ridley v. City of Detroit*, 590 N.W.2d 69, 73 (Mich. Ct. App. 1998), *remanded on other grounds sub nom. Ridley v. Collins*, 622 N.W.2d 65 (Mich. 2000). "While an act of God or the *gross* negligence or intentional misconduct by the victim or a third party will generally be considered a superseding cause, *ordinary* negligence by the victim or a third party will not be regarded as a superseding cause because ordinary negligence is reasonably foreseeable." *People v. Schaefer*, 703 N.W.2d 774, 786 (Mich. 2005); *see also Love v. City of Detroit*, 716 N.W.2d 604, 610 (Mich. Ct. App. 2006) (Cooper, J., dissenting) (applying *Schaefer* to civil case). An intervening cause is considered reasonably foreseeable when the defendant's negligence "enhanc[es] the likelihood that the intervening cause will occur." *Hickey v. Zezulka*, 487 N.W.2d 106, 119 (Mich. 1992). "[W]hether an intervening negligent act of a third person constitutes a superseding proximate cause is a question for the jury." *Ykimoff v. Foote Mem. Hosp.*, 776 N.W.2d 114, 133 (Mich. Ct. App. 2009) (quoting *Taylor v. Wyeth Lab., Inc.*, 362 N.W.2d 293, 300 (Mich. Ct. App. 1984)). Lastly, there may be more than one proximate cause contributing to an injury. *Lewis v. Yale Co.*, 888 F.2d 1391 (Table), 1989 WL 136144, at *2 (6th Cir. Nov. 13, 1989).

Applying this precedent upon reconsideration of its initial Opinion, the district court wrote:

> Regardless of how closely the two vehicles were traveling or how abruptly Defendant made her decision to use the median, Otteren's negligent operation of his own vehicle was a superseding, intervening cause that cut-off any liability on the part of Defendant. Despite Plaintiff's characterization of the two vehicles as "an engine pulling a caboose," there is no evidence to support that Defendant either directed or had any control over the manner in which Otteren operated his own vehicle. Although the two may have been traveling together, Otteren was solely responsible for the safe operation of his vehicle.

This analysis, which is central to Daggett's argument on appeal, is erroneous because it completely overlooks the central consideration of superseding causes—reasonable foreseeability—and replaces it with a "direct or control" test. As discussed above, the matter of direction and control relates to whether there is a special relationship so as to create a duty to protect, a legal concept not applicable to the foreseeability inquiry here. *See Williams*, 418 N.W.2d at 383. Although the district court did find in its initial Opinion that Sandra Rupert "present[ed] no evidence that Otteren was an unsafe driver or would be inclined to follow Daggett into the median even if doing so would be unreasonably dangerous," *Rupert*, 2010 WL 4553650, at *5, a jury could reasonably conclude that Otteren's admitted inclination to follow Daggett without "giv[ing] it a second thought" was foreseeable, and that the maneuver in question was *inherently* dangerous, even if Daggett was able to complete it without striking another vehicle.[6] *See Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 100 (N.Y. 1928) ("Some acts, such as shooting are so imminently dangerous to any one who may come within reach of the missile however unexpectedly, as to impose a duty of prevision not far from that of an insurer.").

The only case upon which the district court's Opinion relied for its conclusion was *Mohr v. Broussard*, 515 So.2d 833 (La. Ct. App. 1987), *aff'd*, 528 So.2d 144 (La.

---

[6]This would be a different case if the maneuver in question was, for example, a legal left turn at an intersection taken by the lead driver in the absence of oncoming traffic.

1988). There, three tractor-trailer drivers on a joint delivery decided to make a U-turn on a highway in order to have a meal together at a nearby restaurant. While the first two drivers, Stelly and Trahan, were making their turns, the third, Broussard, parked his truck on the right shoulder to wait for an opportunity to cross over. "He pulled out from the shoulder and negotiated his tractor across both north bound lanes. As the tractor was entering the south bound side of the highway the left rear of his trailer which was just out of the north bound shoulder was struck by plaintiff's car." *Id.* at 835. At that time, the lead vehicle was one mile down the road from the accident site. The appellate court upheld the jury's determination that Stelly and Trahan were not at fault:

> There was no proof that Stelly or Trahan were directing, supervising, or controlling Broussard. At best from plaintiff's point of view the evidence shows that the three were traveling together. But each one was solely responsible for the safe operation of his vehicle. When Broussard decided to leave the safety of the shoulder and negotiate his "U" turn he set into motion the operative facts causing the accident. The fact that Stelly and Trahan accomplished a similar maneuver in safety a few minutes before could not make them liable for Broussard's failure to exercise reasonable care.

*Id.*[7]

*Mohr* is distinguishable first because it was an appeal of a jury verdict. The factual disputes were resolved and the resulting determinations were appropriately made by the trier of fact. Further, as Sandra Rupert observes, *Mohr* is also distinguishable factually. Broussard had the opportunity to decide when to attempt the U-turn from a place of relative safety in which he could have remained indefinitely. His delayed action also meant oncoming vehicles only had to negotiate one truck. By contrast, Sandra Rupert has presented evidence suggesting that Otteren was almost immediately behind Daggett and had only an instant to decide whether to follow her sudden turn. Additionally, the purported mentor/mentee relationship between Daggett and Otteren

---

[7] The Louisiana Supreme Court stated simply in regard to this issue: "The jury's verdict in favor of Stelly and Trahan is not clearly wrong." *Mohr*, 528 So.2d at 149.

made it more likely that he would resolve the quick decision in favor of staying together rather than separating.[8]

Viewing the evidence in the light most favorable to Sandra Rupert, we conclude that Daggett has failed to meet her burden to show the absence of a genuine issue as to causation because a reasonable jury could find that Daggett's U-turn proximately caused the accident by inducing Otteren's U-turn and "enhanc[ing] the likelihood" of injury to the decedent. *See Schaefer*, 703 N.W.2d at 786; *Ykimoff*, 776 N.W.2d at 133; *Hickey*, 487 N.W.2d at 119.

### 4.    Damages

That this case involves the death of a motorcyclist is undisputed. Sandra Rupert has sufficiently alleged the existence of damages to satisfy a reasonable jury that the final prong of the prima facie negligence case is met. Accordingly, Daggett is not entitled to summary judgment because "a reasonable jury could return a verdict for the nonmoving party." *Slusher*, 540 F.3d at 453.

## C.    Negligence Per Se

Sandra Rupert separately argues that Daggett was negligent per se. Under Michigan law, negligence per se does not mandate strict liability but rather "creates a rebuttable presumption of negligence." *Klanseck v. Anderson Sales & Serv., Inc.*, 393 N.W.2d 356, 360 (Mich. 1986); *Zeni v. Anderson*, 243 N.W.2d 270, 280 (Mich. 1976). We decline to reach this issue because it was not raised in Daggett's Motion for Summary Judgment, decided by the district court, or fully briefed on appeal by both parties.

## III.  CONCLUSION

For the above reasons, we **REVERSE** the district court's grant of summary judgment to Daggett and **REMAND** the case for trial.

---

[8] Although Sandra Rupert's brief suggests there is an additional distinction in that the U-turn here was illegal, it is unclear whether the U-turn in *Mohr* violated any statute or ordinance.